## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

ALICIA MILLER and )
)
CHARLES S. MILLER )
)
6611 Woodley Road )
Clinton, Maryland 20735-2679 )
)
      Plaintiffs )
)
vs. )
) Case No. CAL10-~~31658~~
PNC BANK, NA formerly known as )
NATIONAL CITY BANK, NA )        31663
249 Fifth Avenue )
Pittsburgh, PA 15222 )
)
SERVE ON: )
)
CSC Lawyers Incorporating Service )
Company )
7 St. Paul Street, Suite 1660 )
Baltimore, Maryland 21202 )
)
GLOBAL MORTGAGE INC. )
6297 Farmington Lane )
Woodbine, MD 21797 )
)
SERVE ON: )
)
Calvin Boone, Jr. )
6297 Farmington Lane )
Woodbine, MD 21797 )
)
Laura Evans )
7941 B & A Blvd )
Glen Burnie, Maryland 21061 )
)
JOHN DOE )
)
Defendants )
_____ )

# IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

ALICIA MILLER and )
)
CHARLES S. MILLER )
)
6611 Woodley Road )
Clinton, Maryland 20735-2679 )
)
      Plaintiffs )
)
vs. ) Case No.
)
PNC BANK, NA formerly known as )
NATIONAL CITY BANK, NA )
249 Fifth Avenue )
Pittsburgh, PA 15222 )
)
SERVE ON: )
)
CSC Lawyers Incorporating Service )
Company )
7 St. Paul Street, Suite 1660 )
Baltimore, Maryland 21202 )
)
GLOBAL MORTGAGE INC. )
6297 Farmington Lane )
Woodbine, MD 21797 )
)
SERVE ON: )
)
Calvin Boone, Jr. )
6297 Farmington Lane )
Woodbine, MD 21797 )
)
Laura Evans )
7941 B & A Blvd )
Glen Burnie, Maryland 21061 )
)
JOHN DOE )
)
    Defendants )
_____)

## COMPLAINT

Plaintiffs, Alicia Miller and Charles S. Miller, file the following Complaint alleging claims of negligent misrepresentation, violations of Maryland's consumer protection laws, the Fair Debt Collection Practices Act and the Maryland Commercial Code against PNC Bank, NA (formerly known as National City Bank, NA), Global Mortgage, Inc., Laura Evans and John Doe and in support thereof state as follows:

1. This Court has jurisdiction over this matter pursuant to 6-103 CJP and venue is appropriate in this Court pursuant to 6-202(8) CJP because the events which form the basis for this action occurred in Prince George's County and the property which is the subject of this action is located in Prince George's County.

2. Plaintiffs Alicia Miller and Charles S. Miller are residents of Prince George's County and reside at 6611 Woodley Road, Clinton, Maryland 20735-2679.

3. Defendant PNC Bank, NA formerly known as National City Bank, NA was the lender for the loan which is the subject of this action. It principal place of business is 249 Fifth Avenue, Pittsburgh, PA 15222.

4. Defendant Global Mortgage, Inc. was the loan broker for the loan which is the subject of this action. Its principal place of business is 6297 Farmington Lane, Woodbine, Maryland 21797.

5. Defendant Laura Evans was the loan officer employed by Global Mortgage, Inc. in the transaction that is the subject of this action and her residence is 7941 B & A Blvd, Glen Burnie, Maryland 21061.

6. Defendant John Doe is an appraiser involved in the transaction under underlying this case who is presently not known.

7. On February 16, 2006 Plaintiffs purchased the property know as 6611 Woodley Road, Clinton, Maryland 20735-2679.

8. In July or August of 2007, Plaintiffs were contacted by loan officer Laura Evans, an employee of Global Mortgage Inc. and offered a refinance of their current loan.

9. During the initial consultation, Mrs. Evans advised Mrs. Smith that "her appraiser" would make sure that the appraised value would pass underwriting standards. Subsequently, Mrs. Evans ordered two appraisals. The first inspector completed a cursory review of the property and declined to appraise the property at the value Mrs. Evans requested. As a result, Mrs. Evans ordered a second appraisal. Under the coercion of Mrs. Evans and Global Mortgage -- and unbeknownst to plaintiffs -- the second appraiser valued the property in a manner which allowed Plaintiffs to qualify for their loan.

10. As the loan process proceeded, Mrs. Miller supplied Mrs. Evans with a 2006 U.S. Individual Income Tax Return Form 1040 (2006 U.S. 1040) and current paystubs. With this information, Mrs. Evans improperly calculated Mrs. Miller's monthly income and input that amount into Section V of Uniform Residential Loan Application Form 1003 (Form 1003). Section V is specifically designated to report borrower income. The fabricated monthly income was presented to the underwriter for loan qualification purposes because under applicable underwriting standards, Mrs. Miller could not qualify for a loan utilizing her actual monthly income.

11. To cover up the improper report of Mrs. Miller's income, Mrs. Evans advised Mrs. Miller that the loan was a "stated income" loan and that according to underwriting guidelines, she could input any number that reflected Mrs. Miller's actual income. However, unknown to Mrs. Miller, Mrs. Evans represented that Plaintiff's income was $9,000.00 per month in this section. This amount was inaccurate and greatly exaggerated Mrs. Miller's actual income.

12. Mrs. Evans did not include Charles Miller in the application process because his credit scores were below par and would have prevented Alicia Miller from qualifying for the loan.

13. Prior to completing any work relating to the loan, Global Mortgage Inc. was required to present a broker compensation agreement describing the fee structure to Mrs. Miller. However, Global Mortgage failed to provide Mrs. Miller with a broker compensation agreement. At settlement Plaintiffs were charged a broker fee in the amount of $16,320.80.

14. At the time of settlement, Plaintiffs were overwhelmed with the volume and complexity of the loan documents. As such, they signed the settlement documents at the direction of the settlement agent without review. Plaintiffs were unaware that Mrs. Evans reported Mrs. Smith's income fraudulently until they reviewed the documents at some time after the closing.

15. From October of 2007 until May of 2009, Plaintiffs realized a dramatic decrease in income through a confluence of events that are related to the current economic recession.

16. In June of 2009, Mrs. Miller contacted PNC Bank to request assistance in the form of a loan modification. At this time, Plaintiffs had paid their mortgage payment one (1) month in advance.

17. While discussing the loan modification with a PNC representative, Mrs. Smith asked the representative what effect a loan modification would have upon her credit. The representative advised her that if she made each trial payment on time there would be minimal negative impact upon her credit and that if the trial plan and modification were declined she could resume the contractual payment and any balance owed from the lower payments would be added to the principal amount of the loan and reamortized.

18. The representative further explained that HAMP is a government sponsored program designed to reduce loan payments through a combination of interest rate and or principal reduction. In addition, the representative advised Mrs. Smith that HAMP requires a three (3) month trial plan prior to final modification approval. The trial plan requires the applicant to make a lower trial period payment in lieu of regular payments. This payment is generally close to the payment the applicant will make when the loan is modified. The final loan modification payment is to be determined after the Trial Plan is completed and after the lender reviews the applicants income documents to confirm that the applicant still qualifies.

19. As a result of this conversation, PNC Bank forwarded a loan modification package to Plaintiff which included an application for the Making Home Affordable Program (HAMP).

20. Plaintiff responded by completing the HAMP application and providing PNC Bank with evidence of her hardship as well evidence of her income.

21. Upon receipt of the HAMP application, PNC Bank determined that Mrs. Miller qualified for the Trial Plan and Loan Modification.

22. However, based upon the actual HAMP guidelines, Plaintiff did not qualify for a Trial Plan or a loan modification. At the time Plaintiff applied for the HAMP loan modification, her monthly income was about $1,000.00 while her expenses (not including her mortgage) were $2,312.43 per month. This was clearly documented in her HAMP application. According to HAMP guidelines, when expenses exceed income, an applicant is automatically disqualified and cannot be issued a trial plan.

23. PNC Bank issued a Trial Plan to Plaintiff despite the fact that Plaintiff did not qualify for the trial plan.

24. On October 1, 2009 Plaintiffs started the Trial Plan and remitted a payment in the amount of $1,206.05 to PNC Bank. Plaintiffs continued to make Trial Plan payments until May of 2010.

25. During the trial plan, Mrs. Miller contacted PNC Bank on numerous occasions and the representative affirmed that she qualified for the Trial Plan and that her loan would be permanently modified.

26. On May 11, 2010, PNC Bank issued a letter declining Plaintiff's loan modification because the modification could not yield an affordable payment. In addition, PNC made the determination that Plaintiff had the ability to pay the

current mortgage payment using cash reserves and other assets. This was not true.

27. On May 17, 2010 PNC issued a letter advising Plaintiff that she was in default and would be required to cure an arrearage in the amount of $17,088.71.

28. From the time the Trial Plan started until the loan modification was declined, Mrs. Miller was in continual contact with PNC Bank in an effort to expedite the process. She was told that the only way that she could be disqualified was if she sent in more than $1,206.05 (Trial Plan Payment) or missed any payments. PNC Bank never told Plaintiffs that if they were declined they would owe the balance and be in default. Mrs. Miller was assured during each phone call that the loan modification would be approved and that the delay would not cause complications with her current Note.

29. When the modification was declined, PNC Bank immediately reported Plaintiff late for each month a trial payment was made because the full payment had not been made. This is in direct contradiction to what she was promised by multiple representatives on multiple occasions.

## COUNT I

(Negligent Misrepresentation/ PNC BANK)

30. Paragraphs 1-29 are realleged and incorporated by reference herein.

31. Beginning in June of 2009, Mrs. Miller had a conversation with a representative from PNC Bank, NA during which she was advised that she would qualify for a Trial Plan under the Making Home Affordable Loan Modification Program.

32. During the entire Trial Plan period, representatives of PNC Bank, NA advised Mrs. Smith that she qualified for the Trial Plan and ultimately a loan modification under the Home Affordable Modification Program (HAMP). The Bank representatives did not advise Plaintiffs that if the loan modification was denied that there would be a deficiency which would cause them to be in default.

33. PNC Bank, NA knew or should have known that these representations were false and PNC Bank, NA knew and expected that Plaintiffs would rely on these misrepresentations. Mrs. Miller provided PNC Bank, NA a loan modification application that stated her income was $1,000.00 per month. PNC Bank, NA reviewed this application and improperly offered her a Trial Plan based upon that information.

34. The Plaintiffs did, in fact, rely on these representations to their detriment in that, among other things, they unknowingly allowed an arrearage on their mortgage to come into existence to a point where they could not pay it off and they are now facing foreclosure.

35. As a proximate result, the Plaintiffs have been damaged.

WHEREFORE, Plaintiffs seek an award of damages against PNC Bank, NA, in an amount to be proven at trial but which are, at a minimum, $500,000.00.

### COUNT II
(Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq.*/PNC BANK)

36. Paragraphs 1–35 are realleged, reaffirmed and incorporated herein by reference.

37. Defendant, PNC Bank, NA, is a debt collector as that term is used in the Fair Debt Collection Practices Act, 15 U.S.C. §1692a(6).

38. On September 25, 2007, Plaintiff executed a loan agreement with PNC Bank, NA. The agreement required that Plaintiff make her contractual monthly mortgage payment.

39. On October 1, 2009 Plaintiff executed a loan modification Trial Plan and paid each payment during the plan. PNC Bank accepted each payment during the trial plan and ultimately declined the loan modification.

40. On May 17, 2010 Plaintiff's loan modification was declined and PNC Bank, NA demanded $17,088.71 to cure the alleged default.

41. Subsequently, PNC Bank refused to accept any monthly payment and immediately reported Mrs. Smith late for each month of the trial plan despite the fact that her payments were remitted in full in a timely manner.

42. Plaintiffs timely paid each scheduled monthly trial payment to PNC Bank, NA from October 1, 2009 until May 1, 2010.

43. Defendant has reported Plaintiff late to all credit bureaus from January 2009 until the current date.

44. By virtue of reporting Plaitiffs late, defendant has violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692c(10), 15 U.S.C. §1692f(6).

45. As a result of this inaccurate reporting, Plaintiff has suffered damages in the amount of $400,000.

## COUNT III

(Maryland Consumer Protection Act, §13-301 CL *et seq*/ PNC BANK)

46. Paragraphs 1 – 45 are realleged, reaffirmed and incorporated herein by reference.

47. Defendant is an entity covered by and subject to regulation under the Maryland Consumer Protection Act, §13-301 CL *et seq*

48. In falsely reporting Plaintiff late on her mortgage payment, Defendant materially misrepresented the facts pertaining to her payment history in violation the Maryland Consumer Protection Act, §13-301 CL *et seq.*

49. As a result of these misleading statements Plaintiff has suffered damage in the amount of $400,000 for which all of the Defendant are liable.

## COUNT IV

(Violation of Uniform Commercial Code § 12-805/ Global Mortgage, Inc./Laura Evans)

50. Paragraphs 1-49 are realleged and incorporated by reference herein.

51. Under the Uniform Commercial Code a loan broker in order to be able to charge a fee or commission for his services is required to be licensed by DLLR and to enter into a written contract with the borrower before it (i.e. the broker) beings to arrange a loan for the consumer. That contract must recite the correct fee or fees which are to be charged. § 12-805(d) CL

52. Global Mortgage, Inc did not enter into a written contract with Alicia Miller but notwithstanding this at closing charged Mrs. Miller commissions or finders fees in the amount of $16,320.80.

53. As a result of Global Mortgage, Inc.'s improper collection of fees over charge, Plaintiffs are entitled to damages of three times the amount of fees collected at settlement ($48,962.40)

WHEREFORE, plaintiffs pray that the Court

   a. award plaintiffs compensatory damages in the amount of $500,000, plus attorneys' fees and costs, and

   b. grant such other relief as the Court may consider appropriate

## COUNT V

(Fraud/Global Mortgage Inc./Laura Evans/John Doe Appraiser)

54. Paragraphs 1-53 are realleged and incorporated by reference herein

55. While originating the loan underlying this case, Mrs. Evans generated improper income information and reported it on the Uniform Residential Loan Application Form 1003. This was more than a clerical error. In fact, the income was overstated by more that 100 percent. In addition, Mrs. Evans coerced John Doe Appraiser to appraise the property at a value that exceeded the true value of the home. Mrs. Evans intended to deceive and did deceive PNC Bank underwriters as to the actual value of the property.

56. In so doing, Mrs. Evans failed to disclose to Plaintiffs that this conduct was illegal and that her intention was to conceal from Plaintiffs the fact that they did not qualify for the loan according to lender guidelines.

57. These misrepresentations were made with the expectation that Plaintiffs would rely on them, and in fact, Plaintiffs did rely on the misrepresentations to their detriment.

58. At all times relevant, Mrs. Evans was acting for and on behalf of Global Mortgage, Inc., making Global Mortgage, Inc. responsible for the damages flowing from Mrs. Evans actions.

59. As a proximate result of these acts, Plaintiffs have been damaged.

WHEREFORE, Third Party Plaintiffs seek an award of damages against Third Party Defendants in an amount to be proven at trial but which is, at a minimum, $100,000 and punitive damages of $400,000

Respectfully submitted,

Richard I. Chaifetz
Michael P. Coyle
Thomas M. Sulin
Chaifetz & Coyle, P.C.
9881 Broken Land Parkway, Suite 300
Columbia, Maryland 21046
(443) 546-4608
Attorneys for Plaintiffs

JURY DEMAND

Plaintiffs request a jury trial on their Complaint.

*/s/ Thomas M. Sulin*
Thomas M. Sulin