## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| ALICIA MILLER and<br>CHARLES S. MILLER<br>6611 Woodley Road<br>Clinton, Maryland 20735-2679<br><br>Plaintiffs<br><br>vs.<br><br>PNC BANK, NA formerly known as<br>NATIONAL CITY BANK, NA<br>249 Fifth Avenue<br>Pittsburgh, PA 15222<br><br>SERVE ON:<br><br>CSC Lawyers Incorporating Service<br>Company<br>7 St. Paul Street, Suite 1660<br>Baltimore, Maryland 21202<br><br>and<br><br>Laurie J. Evans<br>1617 Carnoustie Drive<br>Pasadena, Maryland 21122<br><br>Defendants | Case No.  8:10-cv-03211-RWT |

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

## FIRST AMENDED COMPLAINT

Plaintiffs, Alicia Miller and Charles S. Miller, file the following First Amended

Complaint alleging claims of negligent misrepresentation, violations of Maryland's consumer

protection laws, negligence, and Fraud against PNC Bank, NA (formerly known as National City

Bank, NA),  and Laurie J. Evans, and in support thereof state as follows:

1.  This Court has jurisdiction over this matter pursuant to 6-103 CJP and venue is appropriate in this Court pursuant to 6-202(8) CJP because the events which form the basis for this action occurred in Prince George's County and the property which is the subject of this action is located in Prince George's County.

2.  Plaintiffs Alicia Miller and Charles S. Miller are residents of Prince George's County and reside at 6611 Woodley Road, Clinton, Maryland 20735-2679.

3.  Defendant PNC Bank, NA formerly known as National City Bank, NA was the lender for the loan which is the subject of this action.  It principal place of business is 249 Fifth Avenue, Pittsburgh, PA 15222.

4.  Global Mortgage, Inc., was the loan broker for the loan which is the subject of this action.  Its principal place of business was 7020 Holabird Avenue, Dundalk, Maryland 21222.  Global has since filed for Chapter 7 bankruptcy protection.

5.  Defendant Laurie J. Evans was the loan officer employed by Global Mortgage, Inc., in the transaction that is the subject of this action.  Her residence is 1617 Carnoustie Avenue, Pasadena, Maryland 21122, and her place of business is Wells Fargo, 572 Ritchie Highway, Suite F, Severna Park, Maryland 21146

6.  Defendant John Doe is an appraiser involved in the transaction underlying this case who is presently not known.

7.  On February 16, 2006 Plaintiffs purchased the property know as 6611 Woodley Road, Clinton, Maryland 20735-2679.

8.  In July or August of 2007, Plaintiffs were contacted by loan officer Laurie Evans, an employee of Global Mortgage, Inc., and offered a refinance of their current loan.

9.   During the initial consultation, Mrs. Evans advised Mrs. Miller that "her
     appraiser" would make sure that the appraised value would pass underwriting
     standards.   Subsequently, Mrs. Evans ordered two appraisals.  The first appraiser
     completed a cursory review of the property and declined to appraise the property
     at the value Mrs. Evans requested.  As a result, Mrs. Evans ordered a second
     appraisal.   Under the coercion of Mrs. Evans and Global Mortgage – and
     unbeknownst to plaintiffs -- the second appraiser overvalued the property in a
     manner which allowed Plaintiffs to qualify for their loan.

10.  As the loan process proceeded, Mrs. Miller supplied Mrs. Evans with a 2006 U.S.
     Individual Income Tax Return Form 1040 (2006 U.S. 1040) and current paystubs.
     With this information, Mrs. Evans falsely represented Mrs. Miller's monthly
     income and inserted that amount into Section V of Uniform Residential Loan
     Application Form 1003 (Form 1003).   Section V is specifically designated to
     report borrower income.  The fabricated monthly income was presented to the
     underwriter for loan qualification purposes because under applicable underwriting
     standards, Mrs. Miller could not qualify for a loan utilizing her actual monthly
     income.

11.  To cover up the improper report of Mrs. Miller's income, Mrs. Evans advised
     Mrs. Miller that the loan was a "stated income" loan and that according to
     underwriting guidelines, she could state any number that reflected Mrs. Miller's
     actual income.  However, unknown to Mrs. Miller, Mrs. Evans represented that
     Plaintiff's income was $9,000.00 per month in this section.  This was figure
     inaccurate and greatly exaggerated Mrs. Miller's actual income.

12.   Mrs. Evans did not include Charles Miller in the application process because his
       credit scores at the time were below par and would have prevented Alicia Miller
       from qualifying for the loan.

13.   Prior to performing any work relating to the loan, Global Mortgage Inc., was
       required to present a broker compensation agreement describing the fee structure
       to Mrs. Miller.  However, Global Mortgage failed to provide Mrs. Miller with a
       broker compensation agreement.   At settlement Plaintiffs were charged a broker
       fee in the amount of $16,320.80.

14.   At the time of settlement, Plaintiffs were overwhelmed with the volume and
       complexity of the loan documents.   As such, they signed the settlement
       documents at the direction of the settlement agent without review.   Plaintiffs
       were unaware that Mrs. Evans reported Mrs. Miller's income fraudulently until
       they reviewed the documents at some time after the closing. At the Closing, the
       closing officer present in the room represented to plaintiffs that she was an agent
       of National City Bank. Despite the fact of a notary signature and seal on certain of
       the papers, no notary public was present at the Closing and the notarial signature
       was either forged or placed on the documents at a later time.

15.   From October of 2007 until May of 2009, Plaintiffs realized a dramatic decrease
       in income through a confluence of events that are related to the current economic
       recession.

16.   In May of 2009, Mrs. Miller contacted PNC Bank to request assistance in the
       form of a loan modification.   At this time, Plaintiffs had paid their mortgage
       payment one (1) month in advance.

17.     While discussing the loan modification with a PNC representative, Mrs. Miller asked the representative what effect a loan modification would have upon her credit. The representative advised her that if she made each trial payment on time there would be minimal negative impact upon her credit and that if the trial plan and modification were declined she could resume the contractual payment.

18.     The representative further explained that the Home Affordable Mortgage Program (HAMP) is a government sponsored program designed to reduce loan payments through a combination of interest rate and or principal reduction. In addition, the representative advised Mrs. Miller that HAMP requires a three (3) month trial plan prior to final modification approval. The trial plan requires the applicant to make a lower trial period payment in lieu of regular payments. This payment is generally close to the payment the applicant will make when the loan is modified. The final loan modification payment is to be determined after the Trial Plan is completed and after the lender reviews the applicant's income documents to confirm that the applicant still qualifies. In response to an inquiry from Mrs. Miller about including her husband's income in the application, she was incorrectly advised that she could not report her husband's income under the HAMP program and the application was solely dependent on her income.

19.     As a result of this conversation, PNC Bank forwarded a loan modification package to Plaintiff which included an application for the HAMP Program.

20.     Plaintiff responded in June 2009 by completing the HAMP application and providing PNC Bank evidence of her hardship as well evidence of her income.

21.    Upon receipt of the HAMP application, PNC Bank, NA determined that Mrs. Miller qualified for the Trial Plan and Loan Modification and so advised her in writing in September 2009.  Mrs. Miller was also told that a determination on her HAMP application would be made by January 1, 2010.

22.    However, based upon the actual HAMP guidelines, Plaintiff did not qualify for a Trial Plan or a loan modification.   At the time Plaintiff applied for the HAMP loan modification, her monthly income was about  $1,000.00 while her expenses (not including her mortgage) were $2,312.43 per month.  This was clearly documented in her HAMP application.  According to HAMP guidelines, when expenses exceed income, an applicant is automatically disqualified and cannot be issued a trial plan.

23.    PNC Bank issued a Trial Plan to Plaintiff despite the fact that it knew or should have known that  Plaintiff did not qualify for the trial plan.

24.    On October 1, 2009 Plaintiffs started the Trial Plan and remitted a payment in the amount of $1,206.05 to PNC Bank.   Plaintiffs continued to make Trial Plan payments until May of 2010.  During the period of October 1, 2009 through December 31, 2009, PNC did not report Mrs. Miller as being delinquent on the loan.  Plaintiffs were informed in May of 2010 that their application for a loan modification was actually denied on April 9, 2010.  However, the Notice of Intention to Foreclose which plaintiffs later received from PNC asserted that Plaintiffs were in default as of January 2, 2010.

25.    During the trial plan, Mrs. Miller contacted PNC Bank, NA on numerous occasions and the representatives affirmed that she qualified for the Trial Plan and

that her loan would be permanently modified.  On January 15, 2010, Mrs. Miller

contacted PNC about her loan modification application and was advied that no

decision had been made.  She was advised to continue making the trial plan

payment (which she did)rather than the full payment provided in the Note.

26.    On May 3, 2010, Plaintiffs were orally informed that the denial of the loan

modification request had been made on April 9, 2010;  this was  not true.  On

May 11, 2010,  PNC Bank issued a letter declining Plaintiff's loan modification

because the modification could not yield an affordable payment.     In addition,

PNC made the determination that Plaintiff had the ability to pay the current

mortgage payment using cash reserves and other assets.   This was also not true.

On June 29, 2010, PNC's lawyers sent a Notice of Intention to Foreclose to

plaintiffs which stated that the default had occurred on January 2, 2010.  This

could not have happened unless the loan modification application had been denied

at that time which PNC employees consistently represented was not the case.

Moreover, plaintiffs were not informed of the default until May of 2010, despite

the fact that PNC continued to accept and cash plaintiffs' trial plan payments

during the months of January – April, 2010..

27.    On May 19,  2010 PNC issued a letter advising Plaintiff that she would be

required to cure a default in the amount of $17,088.71.

28.    From the time the Trial Plan started until the loan modification was declined, Mrs.

Miller was in continual contact with PNC Bank in an effort to expedite the

process. She was told that the only way that she could be disqualified was if she

sent in more than $1,206.05 (Trial Payment Plan) or missed any payments.  PNC

Bank never told Plaintiffs that if they were declined they would owe the balance immediately and be in default. Mrs. Miller was assured during each phone call that the loan modification would be approved and that the delay would not cause complications with her current Note.

29.   After January 1, 2010, PNC Bank, NA reported Plaintiff late for each month a trial payment was made because the full payment had not been made notwithstanding its unconditional acceptance of the payments and its assurances that Mrs. Miller qualified for and would receive a loan modification.   This is in direct  conflict with what she was promised by multiple representatives on multiple occasions. Mrs. Miller relied on  the representations by PNC's employees in this regard.

## COUNT I

(Negligent Misrepresentation, PNC BANK)

30.   Paragraphs 1-29 are realleged and incorporated by reference herein.

31.   Beginning in 2007, plaintiffs had a contractual relationship with PNC Bank. Beginning in June of 2009, Mrs. Miller had conversations with representatives from PNC Bank, NA during which she was advised that after review of her HAMP application it was determined that she  qualified for a Trial Plan under the Making Home Affordable Loan Modification Program. In reviewing her application and speaking to her about her application, PNC owed a duty of care to plaintiffs to correctly apply the requirements of the HAMP program and to provide her with correct information about whether plaintiffs qualified for a loan modification under that Program.

32.     During the entire Trial Plan period, representatives of PNC Bank, NA, advised
        Mrs. Miller that she qualified for the Trial Plan and ultimately a loan modification
        under HAMP .   The Bank representatives did not advise Plaintiffs that if the
        loan modification was denied that there would be an immediate deficiency with
        penalties which would cause them to be in default.

33.     PNC Bank, NA knew or should have known that these representations were false
        and PNC Bank, NA knew or should have known  and expected that Plaintiffs
        would rely on these misrepresentations.   Mrs. Miller provided PNC Bank, NA a
        loan modification application that stated her income was $1,000.00 per month.
        PNC Bank, NA reviewed this application and improperly offered her a Trial Plan
        based upon that information and contrary to HAMP Guidelines.

34.     The Plaintiffs did, in fact, rely on these representations to their detriment in that,
        among other things, they unknowingly allowed an arrearage on their mortgage to
        come into existence to a point where they could not pay it off and they are now
        facing foreclosure. The reports to credit agencies of partial payments had the
        effect of reducing Mrs. Miller's credit score from 749 in October of 2009 to 622
        in February of 2011. These reports also had the effect of reducing Mrs. Miller's
        credit line on her Mastercard  account from $10,000 to $2,500.  The PNC
        mortgage loan was the only obligation on which plaintiffs were delinquent in that
        time period.  Plaintiffs have also incurred thousands of dollars of late charges as a
        result of having been deemed to be late on their mortgage payments. Further, the
        accumulation of arrears and late charges caused by PNC incorrectly telling Mrs.
        Miller that Mr. Miller's income could not be used in a loan modification has now

caused plaintiffs to be ineligible for a HAMP loan modification and subject to a foreclosure process that could have been avoided had PNC not falsely extended the loan modification process.

35.    As a proximate result, the Plaintiffs have been damaged.

WHEREFORE, Plaintiffs seek an award of damages against PNC Bank, NA, in an amount to be proven at trial but which are, at a minimum, $500,000.00.

## COUNT II

(Omitted)

## COUNT III

(Maryland Consumer Protection Act, §13-301 CL et seq, PNC Bank)

46.    Paragraphs 1 – 35 are realleged, reaffirmed and incorporated herein by reference.

47.    Defendant is an entity covered by and subject to regulation under the Maryland Consumer Protection Act, §13-301 CL et seq

48.    In falsely representing to  Plaintiff  that she qualified for a loan modification and providing her with a trial plan with a payment which was lower than the contractual payment, PNC Bank caused plaintiff to be reported as late on her mortgage payment, defendant materially, falsely and negligently misrepresented the facts pertaining to her eligibility for a loan modification in violation the Maryland Consumer Protection Act, §13-301 CL et seq.

49. As a result of these false statements which caused plaintiffs to make payments which were less than the contractual amount and which underpayments PNC Bank reported to the various credit rating bureaus, Plaintiff has suffered damage to her credit reputation in the amount of $400,000 for which [all of the] Defendant PNC Bank is liable because the reports of partial payments had the effect of reducing Mrs. Miller's credit score from 749 in October of 2009 to 622 in February of 2011. This also had the effect of reducing Mrs. Miller's credit line on her Mastercard account from $10,000 to $2,500. The PNC mortgage loan was the only obligation on which plaintiffs were delinquent in that time period. Plaintiffs have also incurred thousands of dollars of late charges as a result of having been deemed to be late on their mortgage payments. Further, the accumulation of arrears and late charges caused by PNC incorrectly telling Mrs. Miller that Mr. Miller's income could not be used in a loan modification has now caused plaintiffs to be ineligible for a HAMP loan modification and subject to a foreclosure process which could have been avoided had not PNC not negligently extended the loan modification process.

WHEREFORE, plaintiffs pray that the Court

a.   award plaintiffs compensatory damages in the amount of $100,000, plus attorneys' fees and costs, and

b.   grant such other relief as the Court may consider appropriate.

## COUNT IV

(Violation of Uniform Commercial Code § 12-805, Laurie J. Evans)

50. Paragraphs 1- 35 and 46 – 49 are realleged and incorporated by reference herein.

51.   Under the Uniform Commercial Code a loan broker in order to be able to charge a fee or commission for his services is required to be licensed by DLLR and to enter into a written contract with the borrower before it (i.e. the broker) begins to arrange a loan for the consumer. That contract must recite the correct fee or fees which are to be charged. § 12-805(d) CL

52.   Global Mortgage, Inc., and Laurie J. Evans, did not enter into a written contract with Alicia Miller but notwithstanding this at closing charged Mrs. Miller commissions or finders fees in the amount of $16,320.80.

53.   As a result of Global Mortgage, Inc.'s and and Laurie J. Evans' improper collection of fees overcharge, Plaintiffs are entitled to damages of three times the amount of fees collected at settlement ($48,962.40).

WHEREFORE, Plaintiffs pray that the Court

a.      Award plaintiffs compensatory damages in the amount of $48,962.40, and

b.      Grant such other relief as the Court may consider appropriate.

<u>COUNT V</u>

(Fraud/Laurie J. Evans/ John Doe Appraiser)

54.   Paragraphs 1 - 35 and 46 – 53 are realleged and incorporated by reference herein.

55.   While originating the loan underlying this case Mrs. Evans, acting for Global Mortgage, generated improper income information and reported it on the Uniform Residential Loan Application (Form 1003). This was more than a clerical error. In fact the income was overstated by more than 100 percent. In addition, Mrs. Evans coerced John Doe Appraiser to appraise the property at a value that exceeded the

true value of the home. Mrs. Evans intended to deceive and did deceive PNC Bank underwriters as to the actual value of the property.

56. In so doing, Mrs. Evans failed to disclose to plaintiffs that this conduct was illegal and that her intention was to conceal from Plaintiffs the fact that they did not qualify for the loan according to lender guidelines.

57. These misrepresentation were made with the expectation that plaintiffs and PNC would rely on them, and in fact, Plaintiffs and PNC did rely on the misrepresentations to their detriment.

WHEREFORE, plaintiffs pray that the Court

a. award plaintiffs compensatory damages in the amount of $100,000, plus attorneys' fees and costs, and

c. grant such other relief as the Court may consider appropriate.

## COUNT VI

(Negligence, PNC Bank)

58. Paragraphs 1 - 35 and 46 – 57 are realleged and incorporated by reference herein.

59. Beginning in June of 2009, Mrs. Miller had conversations with representatives from PNC Bank, NA during which she was advised that after review of her application it was determined that she qualified for a loan modification under the HAMP Program. PNC Bank also incorrectly told Mrs. Miller that her husband's income could not be considered in connection with a loan modification application. In reviewing her application and speaking to her about her application, PNC owed a duty of care to plaintiffs to correctly apply the requirements of the HAMP program

and to provide them with correct information about whether plaintiffs qualified for a loan modification under that program.  Plaintiffs were entirely dependent on PNC Bank to properly apply the standards of the HAMP Program in their case.

60. During the entire Trial Plan period, representatives of PNC Bank negligently advised Mrs.Miller that she qualified for a loan modification under HAMP.   The Bank representatives did not advise Plaintiffs that if their loan modification was denied there would be a deficiency and penalties which would cause them to be in default.

61. PNC Bank  knew or should have known that its continuing verbal and written representations were false and PNC Bank  knew and expected that Plaintiffs would rely on these isrepresentations.   Mrs. Miller provided a loan modification application to PNC Bank  that stated that her income was $1,000.00 per month. PNC Bank, NA reviewed this application and improperly offered her a Trial Plan based upon that information.

62. The Plaintiffs did, in fact, rely on these representations to their detriment in that, among other things, they unknowingly allowed an arrearage on their mortgage to come into existence to a point where they could not pay it off and they are now facing foreclosure. The plaintiffs' deficiency became due solely because PNC failed to comply with its own procedures and HAMP procedures in the initial 90 day trial period and falsely represented that the evaluation period continued after January 2, 2010.  The amount of plaintiffs' delinquency is solely the result of PNC's negligent conduct and failure to exercise ordinary care.

63. Subsequent to the denial of plaintiffs' loan modification request in April of 2010, in May of 2010, plaintiffs submitted a loan modification request including Mr. Miller's

income.  This request, which otherwise satisfied FNMA standards, was rejected because of the large and longstanding arrears.  This refusal would not have occurred had PNC allowed plaintiffs to submit Mr. Miller's income in support of the loan modification request in 2009.  PNC owed plaintiffs a duty of care to properly implement the FNMA's loan modification guidelines.  Plaintiffs were entirely dependent on PNC Bank to properly implement the loan modification program. PNC breached its duty of care and by virtue of this breach of duty of care plaintiffs were damaged in the manner described herein..

64. As a proximate result, the Plaintiffs have been damaged because the reports of partial payments had the effect of reducing Mrs. Miller's credit score from 749 in October of 2009 to 622 in February of 2011.  This had the effect of reducing Mrs. Miller's credit line on her Mastercard account from $10,000 to $2,500.  The PNC mortgage loan was the only obligation on which plaintiffs were delinquent in that time period. Plaintiffs have also incurred substantial amounts of late charges as a result of having been deemed to be late on their mortgage payments. Further, the accumulation of arrears and late charges caused by PNC incorrectly telling Mrs. Miller that Mr. Miller's income could not be used in a loan modification has now caused plaintiffs to be ineligible for a HAMP loan modification.

WHEREFORE, Plaintiffs seek an award of damages against PNC Bank, in an amount to be proven at trial but which is, at a minimum, $500,000.00.


## COUNT VII

(Negligence, PNC Bank)

65. Paragraphs 1-35 and 46 - 64 are realleged and incorporated by reference herein.

66. Beginning in June of 2009, Mrs. Miller had  conversations with  representatives from
PNC Bank during which she was advised that after review of her application it was
determined that she  qualified for a loan modification  under HAMP. In reviewing
her application and speaking to her about her application, PNC owed a duty of care
to plaintiffs to correctly apply the requirements of the HAMP program and to
provide her with correct information about whether plaintiffs qualified for a loan
modification under that program.

67. During the entire Trial Plan period, representatives of PNC Bank, advised Mrs.
Miller that she qualified for the Trial Plan and ultimately a loan modification under
HAMP.   PNC Bank's  representatives did not advise Plaintiffs that if their loan
modification was denied that there would be a deficiency which would cause them to
be in default. The amount of delinquency is the result of PNC's negligent conduct
and its breach of its duty of care.  PNC negligently caused a delinquency of a sum of
money that was too great for plaintiffs to pay back  to come into existence and which
would not have been due if PNC had exercised ordinary care in accordance with its
own procedures and the HAMP procedures.

68. PNC Bank  had a contractual relationship with plaintiffs.  As such, it had a duty of
care to plaintiffs to properly implement the loan modification program of FNMA.
PNC Bank was negligent when it represented to plaintiffs that Mrs. Miller was
eligible for a loan modification when under a proper application of the applicable
standards she was clearly not eligible.

69. Plaintiffs did, in fact, rely on these misrepresentations which caused them to unknowingly allow an arrearage on their mortgage to come into existence to a point where they could not pay it off and they are now facing foreclosure. The reports of partial payments had the effect of reducing Mrs. Miller's credit score from 749 in October of 2009 to 622 in February of 2011. This also had the effect of reducing Mrs. Miller's credit line on her Mastercard account from $10,000 to $2,500.   The PNC mortgage loan was the only obligation on which plaintiffs were delinquent in that time period.   Plaintiffs have also incurred thousands of dollars of late charges as a result of having been deemed to be late on their mortgage payments. Further, the accumulation of arrears and late charges caused by PNC incorrectly telling Mrs. Miller that Mr. Miller's income could not be used in a loan modification has now caused plaintiffs to be ineligible for a HAMP loan modification.

70.    As a proximate result, the Plaintiffs have been damaged.

WHEREFORE, Plaintiffs seek an award of damages against PNC Bank, NA, in an amount to be proven at trial but which are, at a minimum, $500,000.00.

Respectfully submitted,

__/s/_____
Richard I. Chaifetz  (Bar No. 08755)
Michael P. Coyle (Bar No. 16202)
Chaifetz & Coyle, P.C.
7164 Columbia Gateway Drive, Suite 205
Columbia, Maryland 21046
(443) 546-4608
Attorneys for Plaintiffs

**JURY DEMAND**

Plaintiffs request a jury trial on their Complaint.


\_\_/s/_____
Richard I. Chaifetz



## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing documents has been made on defendant by mailing one copy thereof, first class mail, postage prepaid, to its attorneys Daniel J. Tobin, Hillary G. Benson, Ballard Spahr, LLP, 4800 Montgomery Lane, 7th Floor, Bethesda, Maryland 20814,  this 1st day of June., 2011.

_____/s/_____

Richard I. Chaifetz